Nott, J.,
delivered the opinion of the court:
This is an action brought to recover $32,239 10, for the care and keeping of cavalry horses during the late rebellion.
The case has previously been before the court. On the former trial, a fact deemed important was not disclosed by the evidence. The court believing the claimant’s case to be meritorious, and that he was not chargeable with laches in having *75 failed to offer evidence of this fact, remanded the case to the docket for further evidence and a second trial. (5 O. Cls. B., p. 05.
The existence and legality of two contracts are involved. An officer specially detailed by the Quartermaster General to purchase horses, in conjunction with the Cavalry Bureau, did, in November, 1863, agree with the claimant, by parol, that the defendants should purchase so many cavalry horses, not exceeding four hundred, as he should present for inspection at Bochester, New York, on the 11th December following. The horses were to be such as would pass inspection, and the defendants were to pay for them $130 apiece. The agreement was made after due advertisement in the public papers had been made, but no competitive bids were offered or received, and the officer, in fact, fixed the price and allowed it to all contractors at that place and time. A public exigency, however, required an immediate supply of cavalry horses.
The claimant was ready and willing to deliver three hundred horses, pursuant to the agreement, but the inspecting officers refused to inspect them. He applied, by an agent, to the Chief of the Cavalry Bureau for redress. There is some conflict of testimony at this point as to what passed between the chief and the agent. It may be stated, however, to be this: On the part of the agent it was understood that if the claimant would “build corrals or barns for the horses, feed them well during the winter, and take good care of them, the government would accept them in the spring and pay for their keeping.” On the part of the Chief of the Bureau it was understood that he simply “advised” the claimant to take good care of the horses until spring, when, if the war continued, the government would need more horses, and pay for them very much advanced prices; and he did not agree to pay for these horses’ keeping, nor pledge the government at any time to take them. There was no present consideration paid, no memorandum in writing given, no meeting of minds taking place, no mutual understanding reached. The supposed parol pledge of the officer to pay for the keeping of horses w'hich the government did not own, and might never need, was too vague and loose to be considered a contract. The question therefore is, Did the defendants in any way adopt the mistake of the claimant1? Did they *76 make it their contract and reap from it advantages which preclude them from questioning its validity now?
When the case was first tried there was no conflict of testimony upon this point, and it was assumed by the court that such a parol agreement had, in fact, been entered into by the Chief of the Cavalry Bureau. But it was at the same time held that such a parol agreement, if it existed, was void, and the case was sent back, that its ratification might be shown. Therefore, the attention of both parties has been directed to this subject of ratification, its importance and its necessity.
Upon this, the second trial, it appears by the testimony of one witness that certain inspecting officers came to the farm of the claimant, in the spring of 1864, to inspect horses; that no bargain was then made; that the claimant told the officers “that these were the same horses he had sold Captain Fuller;” and that one hundred and eleven horses not belonging to the claimant were put in under his contract by neighboring farmers, and included in his vouchers.
These vouchers are produced by the defendants. They are simple accounts, referring to no contract — “ The United States to 0. A. Danolds, Dr., for one hundred and ninety-three cavalry horses, at $135 each;”' “The United States to C. A. Danolds, Dr., for one hundred and seventy-nine cavalry horses, at $140 each” — and they are certified and paid by Captain J. L. Trumbull, an assistant quartermaster. In one of the certificates of the inspecting officers it is stated that the one hundred and seventy-nine horses were “presented by C. A. Danolds on agreement made with the chief quartermaster of the Cavalry Bureau.” These are all the facts presented, from which the court is asked to deduce a ratification, by the defendants, of the agreement with Captain Fuller, and an adoption of the supposed agreement with the Chief of the Cavalry Bureau.
As to the inspecting officers, their conversation and their certificate, we are of the opinion that their only oficial duty was to inspect the horses, and that they were neither clothed with authority to bind the defendants by express agreement, nor charged with the care and custody of the horses when they had inspected them.
As to the action of the quartermaster, Captain Trumbull, into whose official cutody these horses actually did go, we think that it was based on some order or authority which is not dis *77 closed; and that while be might have been authorized to buy horses in the market, and, sympathizing' with the claimant for his heavy losses, have chosen to give him a preference in his purchases, yet, that he had neither right nor power- to involve the defendants needlessly by attempting to ratify tbe acts of another assistant quartermaster, of the same rank as himself.
But the greater prices allowed and paid constitute the controlling fact of the case. The consideration being different is conclusive that the contract was different. The obligation cast upon the defendants by Captain Fuller’s agreement was to pay' $130 a horse; the obligation cast upon the defendants by Captain Trumbull’s vouchers was to pay for some $135, and for others $140 a horse. These vouchers are the evidence of the transaction. They were given by the one party and accepted by the other, and have been conclusively ratified by payment. They, moreover, were given for a different and greater number of horses, as well as for a different, and greater price. The parol evidence offered to explain the excess in number explains also the excess in price. It shows thait they were given for the present value of horses in the market. The claimant reaped the benefit of this value in the spring; whether it be little or much, cannot affect the legal character of the transaction. If the agreement with Captain Fuller, and the conversation with General Stoneman, had both been valid contracts, and the parties had then united on this resale, it would have been an election estopping each from ever resorting to his former cause of action.
The judgment of the court is, that the-petition be dismissed.